# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 4, 2010

## STATE OF TENNESSEE v. JONATHAN LOUIS BARNETT

**Appeal from the Circuit Court for Henderson County**
**No. 08-076-1    Roy B. Morgan, Jr., Judge**

---

**No. W2009-01699-CCA-R3-CD  - Filed July 27, 2010**

---

The Defendant, Jonathan Louis Barnett, was convicted of statutory rape, a Class E felony; coercion of a witness, a Class D felony; and attempted sexual exploitation of a minor, a Class E felony.  Pursuant to a plea agreement, the Defendant pled guilty to violating the sexual offender registry laws, a Class E felony, in exchange for concurrent sentencing on all of his convictions.  The trial court sentenced the Defendant to two years for each of the Class E felonies and four years for the Class D felony.  The trial court ordered the sentences to be served concurrently with one another but consecutively to a sentence imposed in an unrelated case.  In this appeal as of right, the Defendant contends that the evidence was insufficient to support his convictions of statutory rape, coercion of a witness, and attempted sexual exploitation of a minor.  Following our review, we reverse and dismiss the Defendant's conviction of coercion of a witness.  We affirm the judgments of the trial court relating to the Defendant's other convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Reversed in Part; Affirmed in Part.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and J.C. MCLIN, JJ., joined.

George Morton Googe, District Public Defender; and Hewitt Chatman, Assistant Public Defender, attorneys for appellant, Jonathan Louis Barnett.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Rachel E. Willis, Assistant Attorney General; James G. Woodall, District Attorney General; and Angela R. Scott, Assistant District Attorney General, attorneys for appellee, State of Tennessee.

# OPINION

The Defendant was convicted of Aggravated Statutory Rape prior to the commission of the instant offenses.[1] Phillip Rande Miller of the Tennessee Board of Probation and Parole testified that he visited the Defendant's house on two occasions. The first visit occurred on June 12, 2008, and the purpose of that visit was to "see on the surface if there was anything that might be contrary to the rules of probation." Mr. Miller arrived at the house and talked with the Defendant, who was present at the house with his two stepdaughters, N.F. and S.F.[2] At that visit, he "didn't see anything that was unusual or out of the way that would lead [him] to look further." His custom on these visits was to remind defendants of the rules of probation and their special conditions imposed upon them. As relevant to the Defendant in this case, he reminded the Defendant that he needed to complete his DNA registration and arrange his counseling sessions.

The second visit occurred on August 8, 2008. Mr. Miller performed this visit because he received a complaint regarding the Defendant. On this visit, like the previous visit, the Defendant was alone with his two step-daughters at the house. In Mr. Miller's walk-through of the Defendant's room, he found that there were male and female articles of clothing in the room. In his investigation, he found that the female articles of clothing belonged to N.F. He remembered that on the previous visit, the Defendant had indicated that N.F. was staying in a separate room. However, on the second visit, he did not find any of N.F.'s personal items in that separate room. "[T]he house was in such an array of clothing, articles, just trash, . . . it would be hard for [him] to say that anybody lived there." All of N.F.'s personal items appeared to be in the Defendant's room.

While he was at the house, another officer found the Defendant's cellular telephone. The officer looked through the cellular telephone and found "pictures on the cell[ular] telephone of [N.F.]." In these pictures, N.F. was not always fully clothed. Mr. Miller then identified one of the pictures of N.F. that was found on the telephone. The picture was altered for purposes of the trial, but in the picture presented at trial, N.F. appeared to be wearing pants and nothing else.

Mr. Miller also identified a letter that he was given on September 11, 2008. The letter, mailed from the Henderson County jail, contained three parts. The first part was

---

[1]The jury was not aware of the substance of the prior conviction, but the jury was aware that the Defendant was on probation for a prior conviction.

[2]It is the policy of this court to refer to victims of sexual offenses by their initials. As N.F. was the victim in this case, we will refer to all of her siblings by their initials to further protect her anonymity.

addressed to N.F., the second part was addressed to S.F., and the third part was addressed to someone referred to as "Nat." All three parts were written and signed by the Defendant. Mr. Miller read the parts of the letter that were written to N.F. On the front page of the letter, the Defendant wrote, "[D]on't keep this[.] [R]ead it then get ride [sic] of it." On the second page, the Defendant wrote,

> Well, court is on [September the 9th,] and if your [sic] say what we talk about[,] I should be good but you have to be there if you have to just leave to be there you know okay.

On the third page, the Defendant wrote,

> I want you in my arms so bad[.] I want to smell your perfume[,] see you in the blue thing[, and] her [sic] you whisper I love you more in my ear[.] [Y]ou are so awesome to me[.] You got me so bad[.] I hope you don't hurt me[,] but you said you wouldn't.

On the last page, the Defendant wrote,

> P[.]S[.] [G]od I hope nobody reads this[,] but you tear it up and throw it away at school[.] [O]kay.

On cross-examination, Mr. Miller admitted that he did not know who used the bathroom that was attached to the Defendant's bedroom. The bathroom contained makeup and male and female clothing. He admitted that he did not question the Defendant about the photographs and that he did not really know who owned the phone.

N.F., who was seventeen at the time of trial, testified that she was born on May 3, 1991 and that the Defendant had been taking care of her since she was two years old. The Defendant was married to her mother, but they separated in November 2007. She lived with the Defendant and her siblings, S.F. and T.B., in the Defendant's house. The Defendant's father, Mr. Barnett, lived with them at the house for approximately one month.

In May 2008, N.F. went with her sister and Natalie Bobo to "Memphis in May." Five or ten days later, she started having sex with the Defendant. From May 2008 until August 2008, they had sex "[l]ess than ten times." She said she was sixteen years old when she started having sex with the Defendant.[3]

_____

[3] As her birthday was on May 3, 1991, she was probably seventeen when she started having sex with

(continued...)

N.F. identified the photograph of herself that was taken with a cellular telephone. She stated that the Defendant took the photograph. She also stated that the first letter that was previously read into evidence contained the Defendant's handwriting. She identified two other letters that were written by the Defendant and sent to her. She was unable to read the second letter, but she read a portion of the third letter into the record. On the second page of the third letter, the Defendant wrote,

> Anyway[,] I love you and say it over and over[.] I never said anything to cops said I said [sic] they lie to get you to say things against me which I hope you didn't[.] I love you[.] [D]on't let this be like Nora where you and [S.F.] use me tell [s - - t] on me and leave me I don't think you would but I would be so hurt and would die for real if you do. If I do die[,] you get the car . . . and the house [-] the insurance should pay for it[.] [You're] my life[.] [T]alk to your mom[.] [Sit] down and tell her that now or later we will be together. [L]ove you.

N.F. then admitted that at the preliminary hearing she testified that she did not have sex with the Defendant. She explained that she lied at the preliminary hearing because she was "nervous."

On cross-examination, N.F. testified that she moved into the Defendant's house with her family in August 2006. Her mother moved out in the Fall of 2007. At that time, the Defendant was in the military and would stay in Fort Campbell, Kentucky from Sunday until Friday. Approximately two months after her mother left, Mr. Barnett moved into the house. In the house, there were four bedrooms and two bathrooms. She shared the master bathroom with the Defendant, and her sister used the other bathroom. Her "original bedroom was downstairs," but she stopped using that bedroom after it was flooded. When Mr. Barnett stayed at the house, she or Mr. Barnett slept on the couch in the living room. She admitted that she used the Defendant's phone to take some pictures of her family, but she did not take the pictures of herself. She denied ever receiving the letters written to her by the Defendant. The letters were mailed to a person named Natalie, who gave them to N.F.'s mother.

On re-direct examination, she admitted that she and the Defendant had agreed to "not tell the truth" if police officers asked them about their relationship. On re-cross examination, she admitted that the agreement was not a written agreement.

---

[3](...continued)
the Defendant.

Captain Anthony Woodfin of the Henderson County Sheriff's Department testified that he assisted in the investigation of the Defendant's residence. He noticed that S.F. and T.B. appeared to have their own bedroom and that a female appeared to be sharing the master bedroom with the Defendant. He recovered the Defendant's cellular telephone during the investigation and found photographs on the telephone.

Captain Woodfin conducted the interrogation of the Defendant after the Defendant waived his Miranda rights. The Defendant wrote the first part of his statement, and Captain Woodfin completed the statement for the Defendant as he was told what to write. The Defendant reviewed the statement before signing it. In the statement, the Defendant discussed his relationship with N.F., stating, "[S]he and I discussed marr[i]age . . . when she turned 18." The Defendant acknowledged that he had a sexual relationship with N.F. and that they began engaging in sexual activities in May 2008. They had sex "on average once a week since May." He knew that there were two photographs of N.F. on his phone, but he denied taking the pictures. He stated, "I knew it was there and I wanted to ask her about it." In relation to the other photograph, he stated, "I also knew about the picture of [N.F.] in the bra and pants because she wanted to know how they looked on her[.] That picture was for herself." At the bottom of the page, Captain Woodfin and the Defendant both signed and dated the form. After the Defendant was arrested, N.F.'s mother contacted Captain Woodfin and told him that the Defendant was writing letters to N.F. and the other children. She gave him some of the letters.

On cross-examination, Captain Woodfin stated that the Defendant told him that N.F.'s room was downstairs. The cellular telephone was taken from the Defendant's pocket, but N.F. initially told him that she took some of the photographs on the phone. The Defendant also told him that N.F. took the pictures for the Defendant. Relative to the Defendant's statement, Captain Woodfin testified that the Defendant started to get upset when they discussed his relationship with N.F. Captain Woodfin admitted that some of his conversation with the Defendant was not transcribed into the statement.

S.F., who was sixteen at the time of the trial, testified on behalf of the Defendant. She said that she and T.B. each had their own room, but that they "rotated." Sometimes they would "fall asleep watching TV in [the Defendant's] room, but [she] mainly slept in [her] room. [N.F.] . . . just rotated." However, she never saw or heard N.F. and the Defendant engaged in sexual activity. She was present in the house most of the time, and all of the bedroom doors remained open while everyone slept.

Mr. Barnett testified that he moved into the Defendant's house to help the Defendant care for the children because the Defendant "was in the military and gone most of the time." When he was staying at the Defendant's house, he "slept in [the Defendant's] bedroom while

[the Defendant] was gone." All of the children had their own bedrooms, and when the Defendant was home, the children slept in their rooms while either the Defendant or Mr. Barnett slept on the couch. Mr. Barnett never observed any sexual activity between the Defendant and the children. However, he admitted that he was not always at the house on the weekends and that he moved out in May 2008 when the school year finished.

The Defendant testified that the children "slept where they wanted" in the house "during the summer months." On school nights, the children would sleep in their bedrooms. At first, T.B. stayed in the downstairs bedroom, but he usually wanted to sleep in the Defendant's bedroom. He said that the "girls would come in [his bedroom] every now and then because [T.B.] was in there." They also had three bathrooms, but the downstairs bathroom was never used. N.F. liked to use the Defendant's bathroom because it had "huge full length mirrors on both sides" and a "double sink." However, "[e]verybody used any bathroom that they wanted to."

The Defendant denied ever having a sexual relationship with N.F. He admitted that he "wrote the very first part of [his] statement" when he was "very, very upset." He did not know that Captain Woodfin added anything to his statement after he wrote the first paragraph and signed the form. He acknowledged that his signature appeared on the bottom of the form but explained that he "should've signed it a little closer to [his] part" to prevent anyone from adding anything to his statement.

On cross-examination, he explained that he told N.F. to throw away his letter because "her mother is bad about concocting things." He explained that the "little blue thing" he referenced in his letter related to a skit that N.F. used to do while wearing a blue outfit. He insisted that N.F. took the picture on his telephone and that he did not know the photograph was on his telephone. He explained that the "whole marriage thing was her mother's deal, and [they] used to joke about it and laugh about it a lot."

ANALYSIS

The Defendant contends that the evidence was insufficient to support his convictions because the testimony at trial was inconsistent. He also contends that he did not write portions of his statement that were admitted into evidence. The State responds that the evidence was sufficient to sustain his convictions.

Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating

-6-

why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Relative to the Defendant's conviction of statutory rape, as relevant to this case, the Tennessee Code Annotated defines statutory rape as

the unlawful sexual penetration of a victim by the defendant or of the defendant by the victim when:

. . .

(2) The victim is at least fifteen (15) but less than eighteen (18) years of age and the defendant is more than five (5) years older than the victim.

Tenn. Code Ann. § 39-13-506(b)(2). The Tennessee Code Annotated defines sexual penetration as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

In the light most favorable to the State, the evidence in this case reflects that the Defendant engaged in sexual intercourse with the victim. The victim was born on March 3, 1991 and was either sixteen or seventeen when she began having sex with the Defendant. As reflected in Exhibit 6 signed by the Defendant, the Defendant was born on August 15, 1972; therefore, he was at least four years older than the victim. The Defendant admitted in his statement that he loved N.F., that he wanted to marry her, and that he engaged in sexual activities, including sexual intercourse, with her. The Defendant urged this court to consider the fact that the victim's testimony at trial was inconsistent with her testimony at the preliminary hearing, where she denied ever having a sexual relationship with the Defendant. The Defendant also contends that he did not write the second portion of his statement, which reflected that he had sex with N.F., and that testimony from Mr. Barnett and S.F. confirmed his assertion that he did not have sex with N.F. However, any questions regarding the victim's credibility and inconsistencies in the testimony were resolved by the jury. Accordingly, we conclude that the evidence was sufficient to support the Defendant's conviction of statutory rape.

Relative to the Defendant's conviction of coercion of a witness, in order to sustain a conviction for this offense, as relevant to this case, the State had to prove that the Defendant

"by means of coercion, influence[d] or attempt[ed] to influence a witness . . . in an official proceeding with intent to influence the witness to . . . [t]estify falsely [or] [w]ithhold any truthful testimony, truthful information, document or thing" Tenn. Code Ann. § 39-16-507(a)(1). The Tennessee Code Annotated defines coercion as

> a threat, however communicated, to:
>
>      (A) Commit any offense;
>      (B) Wrongfully accuse any person of any offense;
>      (C) Expose any person to hatred, contempt or ridicule;
>      (D) Harm the credit or business repute of any person; or
>      (E) Take or withhold action as a public servant or cause a public
>      servant to take or withhold action.

Tenn. Code Ann. § 39-11-106(a)(3). A close reading of the statute defining coercion and review of pertinent case law, reflects that, in order to sustain a conviction for coercion of a witness, the defendant must have threatened the victim in some manner. See State v. Larry D. LaForce, II, No. E2007-00334-CCA-R3-CD, 2008 WL 538969 (Tenn. Crim. App. Feb. 27, 2008) (affirming a defendant's conviction of coercion of a witness when the defendant "made threatening remarks" to a witness for the purpose of "preventing or influencing any further damaging testimony by her as a witness"); State v. Paul O. Dickens, Sr., No. M2005-00571-CCA-R3-CD, 2006 WL 359664 (Tenn. Crim. App. Feb. 15, 2006), perm. app. denied (Tenn. June 26, 2006) (affirming a defendant's convictions for two counts of coercion of a witness when the defendant communicated threats through a third-party to harm the victims if they did not testify falsely or if the defendant had to serve any time once convicted); State v. Bobby Joe Lester, No. W2004-00842-CCA-R3-CD, 2005 WL 1798763 (Tenn. Crim. App. July 28, 2005) (affirming a defendant's conviction of coercion of a witness when the defendant attacked, raped, and told the victim to "call Sergeant Colbert and drop the charges" against his friend).

In the light most favorable to the State, the evidence in this case shows that the Defendant and the victim had agreed to deny that they had a sexual relationship and that the Defendant sent letters to the victim instructing her to deny their sexual relationship. In one such letter, the Defendant instructed the victim to destroy the letter. In another letter, the Defendant stated that he hoped that the victim did not "tell [s - - t] on [him] and leave [him]." The Defendant went on to state, "I don't think you would but I would be so hurt and would die for real if you do. If I do die[,] you get the car . . . and the house." While the letters presented at trial are disturbing in their content, the Defendant does not threaten the victim in the letters. Additionally, the victim did not testify at trial that the Defendant ever threatened her. Accordingly, we conclude that the evidence was insufficient to support the

Defendant's conviction of coercion of a witness; therefore, we reverse and dismiss his conviction of coercion of a witness.

Relative to the Defendant's conviction of attempted sexual exploitation of a minor, in order to sustain a conviction for this offense, as relevant to this case, the State had to prove that the Defendant attempted to "knowingly possess material that include[d] a minor engaged in . . . [s]exual activity; or . . . [s]imulated sexual activity that is patently offensive." Tenn. Code Ann. § 39-17-1003(a); see also Tenn. Code Ann. § 39-12-107. As relevant to this case, the Tennessee Code Annotated defines sexual activity as "[l]ascivious exhibition of the female breast or the genitals, buttocks, anus or pubic or rectal area of any person." Tenn. Code Ann. § 39-17-1002(8)(G). In the light most favorable to the State, the record reflects that the Defendant possessed a photograph of the victim in which the victim's breasts were exposed. The Defendant urged us to consider the fact that at the preliminary hearing, the victim testified that she took the photograph of herself. However, in order to sustain a conviction for attempted sexual exploitation of a minor, the Defendant did not have to take the photograph, he merely had to knowingly possess the photograph. Accordingly, we conclude that the evidence was sufficient to support the Defendant's conviction of attempted sexual exploitation of a minor.

## CONCLUSION

In consideration of the foregoing and the record as a whole, we reverse and dismiss the Defendant's conviction of coercion of a witness. We affirm the judgments of the trial court relating to the Defendant's other convictions.

_____
D. KELLY THOMAS, JR., JUDGE